**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:21-CV-121-TBR**


**BRIAN C. BROWN, AS TRUSTEE**
**OF THE BROWN FAMILY TRUST,**                                    **PLAINTIFF**


**v.**


**PATTY WITTY, INDIVIDUALLY AND**
**AS PERSONAL REPRESENTATIVE OF**
**THE WILLIAM M. WITTY ESTATE,**                         **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the Defendants' Motion for Summary Judgment,

[DN 24], and Plaintiff's Cross-Motion for Summary Judgment, [DN 25]. Plaintiff has responded

to Defendant's motion, [DN 25], and Defendant has replied and responded to Plaintiff's Cross-

Motion for Summary Judgment, [DN 27]. Plaintiff has also filed a reply to Defendant's response,

[DN 31]. Both motions are therefore fully briefed and ripe for review. For the reasons set forth

below, the Court will deny Defendants' Motion for Summary Judgment, [DN 24], and grant in

part and deny in part Plaintiff's Cross-Motion for Summary Judgment, [DN 27].

**I.       BACKGROUND**

Patty Witty's husband, William, died testate on June 3, 2017. [DN 24-3; DN 25-3]. At the

time of his death, William and Patty resided in Texas. [DN 24-3]. However, William owned a

seventy-six-acre parcel of land in Christian County, Kentucky, having inherited it from an uncle

several years earlier. [DN 24-2]. Under William's will, Patty, his sole devisee and beneficiary, inherited the Kentucky property. [DN 25-3].

Sometime in 2019, Patty began discussing the potential sale of the property with Plaintiff Brian Casey Brown. *See* [DN 25-10]. Brown is a real estate agent and the owner/operator of a real estate investment company. *See* [DN 27, p. 2]; ABOUT CASEY BROWN, www.3000capital.com/about/ (last visited June 30, 2022). In September 2019, he sent out a "mass mailer" advertisement, and Patty responded. [DN 25-10]. According to Brown, Patty requested that Brown perform a market analysis on Kentucky property, but when he did so, she felt that his analysis was too low. *Id.* Later, in April 2021, Patty advised Brown that she was still interested in selling the farm, and she would take $380,000 for it. *Id.*

On May 7, 2021, Patty entered into a Purchase and Sale Contract to sell the Kentucky property to Brown. [DN 25-1]. Under the contract, Patty promised to sell the Kentucky property for a total purchase price of $380,000, with the sale to close on or before August 7, 2021. *Id.* In addition to other terms, the contract stated that the buyer (Brown) would deposit a $1000 check to the seller (Patty) within two calendar days of the acceptance of his offer. *Id.* Toward the end of the contract, just prior to the buyer and seller signature lines, there are two handwritten terms, numbered as "1" and "2." *Id.* The first states, "Seller knows and understands that buyer is a licensed real estate agent in Ky. No commission will be paid." *Id.* The second handwritten term states "Buyer will pay for & take care of probate process for seller." *Id.* Brown states in an affidavit that he wrote in these terms by hand prior to Patty's signing of the contract. [DN 25-10].

Brown further states that, pursuant to the second handwritten term, he engaged an attorney to assist in probating William Witty's estate in Christian County, Kentucky. *Id.* Brown

communicated with Patty about the probate process on multiple occasions. For example, on May 11, 2021, Brown emailed Patty, stating that he had "engaged the attorney in order to get the will probated" and instructing her to speak with the attorney and provide him with a copy of William's original will. [DN 25-4]. A few days later, on May 19, 2021, he emailed her again, asking that she "let [him] know as soon as the process is started there," presumably meaning the probate process in Texas. [DN 25-5]. He further advised that "[a]s long as the attorney gives us reasonable assurance that the will is being probated we can move the purchase forward." *Id.* On June 2, 2021, Brown emailed Patty asking for "any updates on the attorney situation" and explaining that they could "go ahead and probate the will here in KY if we need to" and offering to pay Patty's attorney to finish the probate process in Texas, if necessary. [DN 25-6]. A few days later, on June 16, 2021, Brown again emailed Patty about the probate process, asking "how things are coming along with the probate," and asking whether it had been filed yet and the name of the attorney handling it. [DN 25-7]. There is no evidence in the record indicating that Patty responded to these emails, but there is evidence that the parties had at least one phone conversation around this time. *See, e.g.*, [DN 25-8 (noting that the parties had a conversation on June 25, 2021 about obtaining copies of William's will)].

On June 26, 2021, Brown again emailed Patty. [DN 25-8]. He explained that a man had called him claiming to be Patty's son. *Id.* According to Brown, the caller screamed at him and threated his family and his livelihood. *Id.* More specifically, the caller threatened Brown with "harsh consequences" if he refused to release Patty from the sale contract. *Id.* Brown advised that he was "uncertain as to the validity of what just happened," and noted that he and Patty had conversed the day before about obtaining copies of William's will. *Id.* Based on that conversation, Brown assumed that Patty had not authorized her son's behavior, but he provided

the contact information for his attorney and his own phone number so they could discuss the matter further. *Id.*

> Within an hour, Patty replied to Brown's email. *Id.* Her email states, in full,

> I am requesting to be released from our contract on the Witty farm by 9:00A.M. (sic) Monday morning June 28th. You are in default of said contract, page 2 paragraph 4 DEPOSIT. Contract states buyer will deposit within two calendar days of acceptance in the form of a check with seller.

*Id.* Brown responded, "I mailed the check that day." *Id.* When Patty asked to whom he had mailed the check, Brown explained that he had mailed it to Patty's home address and would have his accountant check on it. *Id.* He also implored Patty to explain why she had changed her mind after allowing Brown to "go through all the expense of obtaining a loan along with selling the properties I sold to make this happen." *Id.* The Court understands that he was referring to certain rental properties that he owned and then sold to fund the down payment on the Witty farm. [DN 25-10].

> On July 6, 2021, Brown sent a final email to Patty. [DN 25-9]. He explained that it would be his last email before taking legal action to enforce the sale contract. *Id.* He further cited to the various expenses that he had incurred and noted that, after discussing the matter with his attorney, he would have "no other choice" but to pursue a lawsuit, "unless this is remedied or there is some communication from you at least regarding the monies I was out in the transaction." *Id.* He noted that Patty had spoken with Brown's lawyer and told the lawyer "that the only remedy to this was for [Brown] to pay double the price [they] had agreed to." *Id.* He explained that, based on his appraisal, the farm was not worth that amount, and he invited her to request her own appraisal of the property. *Id.* He ended by emphasizing his desire to purchase the land as a "home place farm" for his family and stressed that he was *not* purchasing it for a development. *Id.*

4

Nevertheless, Patty contends that Brown's true intention "was to 'lowball' Patty, and then turn around and pocket a profit of at least $170,000." [DN 27, p. 3]. For support, Patty cites a non-binding Letter of Intent attached to Brown's response brief. [DN 25-18]. In that letter, a potential buyer indicates his intention to purchase the Witty farm from Brown for $550,000. *Id.* Patty argues that this "was contrary to [Brown's] representations that he and his family were excited to have a 'family farm.'" *Id.* The Court notes, however, that the Letter of Intent is dated December 13, 2021 and is signed only by the potential buyer, *id.*, while Brown indicated an intent to purchase the farm for his family in July 2021, prior to this lawsuit being filed. *Id.* Further, in his response brief, Brown explains that he initially intended to keep the property for his family and only considered selling it after property values began to climb. *See* [DN 31, p. 9 n.2].

On August 10, 2021, Brown filed suit in Christian Circuit Court. [DN 1-1]. He requested a declaratory judgment stating that the sale contract is valid and that he is entitled to specific performance of the contract. *Id.* Patty then removed the case to this Court on August 30, 2021. [DN 1]. Brown subsequently amended his complaint to add a breach of contract claim. [DN 15]. Patty then filed the present Motion for Summary Judgment, arguing that the contract is null, void, and unenforceable because she lacked authority to sell the property and Brown failed to satisfy certain conditions precedent. [DN 24]. Brown filed a cross-motion for summary judgment, seeking a declaratory judgment that the contract is valid and that he is entitled to specific performance or, in the alternative, compensatory damages. [DN 25]. Both motions are now fully briefed and ripe for review. [DN 27; DN 31].

## II.      STANDARD OF REVIEW

To grant a motion for summary judgment, the Court must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In reviewing a motion for summary judgment, the Court must review the evidence in the light most favorable to the non-moving party; however, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

### III.     ANALYSIS

#### A.  Patty Witty's Authority to Sell in Her Individual Capacity

Patty first argues that she could not sell the Witty farm because she did not own it at the time she signed the sale contract. She argues that it passed directly to William's estate, and notes that she signed the contract in her individual capacity, not as a representative of the estate. [DN 24-1, pp. 4–5]. Brown disputes this, arguing that the property passed to Patty, the sole devisee of William Witty's estate, at the time of his death. [DN 25, pp. 4–5]. Patty argues that probate of the will is required for title to vest in a beneficiary. [DN 27, pp. 4–7].

In her initial motion, Patty fails to cite any authority in support of her argument that title passes only upon probate. In her reply brief, Patty cites to two cases; however, the Court finds that neither is persuasive. In *Levin v. Ferrer*, 535 S.W.2d 79 (Ky. 1975), a mother deeded a large tract of land to her daughter, but the deed was later declared null and void. *Id.* at 80. The mother then executed a will, devising a portion of that land to other individuals and only $500.00 to her daughter. *Id.* Shortly thereafter, the mother died, and the will was probated. *Id.*  The daughter nevertheless filed a motion seeking relief from the earlier judgment cancelling the deed. *Id.* at 80–81. The trial court denied her motion as untimely, and the daughter appealed. *Id.* However, in that appeal, she named only the administrator of her mother's estate as appellee and did not name the devisees of the land. *Id.* at 81. The Kentucky court ultimately concluded that those devisees were indispensable parties. *Id.* at 81–82.

In reaching that conclusion, the Court considered the facts of the case and noted that "at the time of her death on February 19, 1972, [the mother] was the owner of the real estate, *and when the will was probated* on March 13, 1972, title to this property immediately vested in [the devisees named in the will]." *Id.* at 81 (emphasis added) (citing *Stewart v. Morris*, 231 S.W.2d

70 (1950)). Patty cites to this line as a "clear statement of law," [DN 27, p. 5]; however, it is, at best, dicta. In fact, the case cited by the Kentucky court in support of that statement suggests that a devisee's interest vests *at the time of death*. In that case, *Stewart v. Morris*, the parties disputed whether the deceased's wife took a life estate or fee simple under his will. 231 S.W.2d at 71. The issue before the *Stewart* court was whether a new rule, announced just weeks after the deceased's death, applied to the wife's interest. *Id.* That rule did not affect previously vested rights, and the court therefore had to determine when the wife's interest vested. The court concluded that "the right of the devisee became vested upon the death of the testator." *Id.* at 72.

Having reviewed the *Levin* and *Stewart* cases, the Court cannot reach the strained conclusion offered by Patty—i.e., that the statement "when the will was probated" in *Levin* stands for the proposition that a devisee's interest vests only once the will is probated. That offhand statement was certainly not the court's holding in *Levin*. Further, the court's citation to *Stewart* suggests that the statement "when the will was probated" was more likely a *misstatement* of the law, rather than a "clear statement of the law" as Patty argues. *See* [DN 27, p. 5]. The Court therefore finds the *Levin* case to be unpersuasive.

 The next case cited by Patty, *Kentucky Bar Association v. Thomas*, 927 S.W.2d 838 (Ky. 1996) is equally unconvincing. That case is a Kentucky Bar Administration attorney discipline ruling. The attorney, Thomas, was found guilty of unethical and unprofessional conduct "because he failed to complete an ancillary administration of an estate with reasonable diligence and failed to keep a client reasonably informed as to the status of the matter entrusted to him." *Id.* at 838. The decedent was an Ohio resident but owned two pieces of real estate in Kentucky, and the executrix of his estate retained Thomas "to assist in ancillary administration necessary to transfer the Kentucky real estate." *Id.* at 839. Thomas found a buyer for one of the two pieces of

8

realty and eventually sold and transferred that property. *Id.* However, he was unresponsive to his client's requests to complete the ancillary estate and transfer the remaining property, and he was disciplined as a result. *Id.*

Patty cites to this case, stating that, "[i]n the context of an attorney disciplinary procedure, the Kentucky Supreme Court succinctly stated that 'ancillary administration [was] necessary to transfer the Kentucky real estate.'" [DN 27, p. 5 (emphasis added by Defendant)]. This is a mischaracterization of the Kentucky court's statement. The quoted statement relied upon by Patty is contained within the factual background of the case, specifically the court's explanation as to why Thomas was hired by the executrix: "In July of 1990, Thomas was hired by an Executrix, whose decedent was an Ohio resident who owned an interest in two parcels of real estate located in Harlan and Wayne County, Kentucky, to assist in ancillary administration necessary to transfer the Kentucky real estate." *Thomas*, 927 S.W.2d at 838. Nowhere in the *Thomas* opinion does the court hold, or even suggest, that a will must be probated before a devisee takes title to real estate. The Court therefore finds that Patty's reliance on *Thomas* is misplaced.

Patty also relies on a statement in a Kentucky Estate Administration manual published by the University of Kentucky Office of Continuing Legal Education. [DN 27, p. 5]. The manual states,

> The will is the instrument of title if ownership passes to devisees under the terms of a will. *The will must first be admitted to probate.* It is then recorded in the county court clerk's office in the same county where probate proceedings were initiated. If decedent's realty is located in other counties, an attested copy of the order of probate and an attested copy of the will must be recorded in the other counties. KRS 394.300.

UK/CLE, KENTUCKY ESTATE ADMINISTRATION, (6th ed. 2020) (emphasis added). Patty cites specifically to the above-emphasized statement, but this statement must be read in context.

First, this statement is contained within a section entitled "Requirements for Sale by Heirs or Devisees." *Id.* The preceding paragraph reads,

> Absent a testamentary power of sale in the personal representative, the decedent's heirs or devisees are the proper persons to sell and convey decedent's realty. Before a deed of conveyance can be made by the heirs or devisees, their ownership must be established in the chain of title.

*Id.* This paragraph is followed by the passage cited by Patty, quoted above, in which the author explains that the will is the instrument of title and must be probated to establish the chain of title. The Court therefore understands that this portion of the CLE manual simply explains that, in order to establish the chain of title (i.e, to prove ownership) of the devised real estate so it may be sold, the will (the instrument of title) must be probated. It does *not* state that probate is necessary to transfer title from the testator to the devisee. In other words, while title may vest immediately upon the testator's death, the devisee cannot then transfer that title to another without first establishing a chain of title—by probating the will.[1]

This conclusion is supported by Kentucky case law. This issue has been considered by Kentucky courts on several occasions, usually when the courts must determine which parties are indispensable to an action involving an estate. For example, in *Slone v. Casey*, 194 S.W.3d 336 (Ky. App. 2006), two property owners sued to resolve a boundary line dispute with their neighbors, but one of the property owners passed away during the pendency of the suit. *Id.* at 337. The administratrix of his estate revived the action in the name of the personal representative, and ultimately appealed the trial court's ruling in her capacity as administratrix. *Id.* The Court of Appeals of Kentucky dismissed the appeal for failure to name an indispensable party. *Id.* The court explained, "Upon death of an owner of real property, the title to said

---

[1] This explains why the court in *Thomas* noted that ancillary administration of the estate was necessary to transfer title.

property passes directly to the heirs at law or to the beneficiaries under a will; it does not pass through the estate." *Id.* at 337 (citing *Wood v. Wingfield*, 816 S.W.2d 899 (Ky. 1991)). As a result, the court explained, "the personal representative of the estate has no interest in or title to the real property. Rather, the heirs or the beneficiaries are considered the real parties in interest to a proceeding involving the real property." *Id.* (citing *Levin*, 535 S.W. 2d at 79). The court therefore concluded that the administratrix of the estate had "no interest in or title to the disputed real property," and the beneficiary was the proper party-in-interest. *Id.* at 338.

In reaching this conclusion, the *Slone* court relied in part on *Wood v. Wingfield*, 816 S.W.2d 899 (Ky. 1991). In that case, the Supreme Court of Kentucky considered the differences in the way that real property and personal property descend. After evaluating various authorities, the court concluded that "it is plain that title to real estate owned by an intestate passes directly to the heirs" of the decedent. *Id.* at 902. Unlike personal property, which "must first pass through administration," real property "vests in the persons designated by [statute] as a matter of law upon the death of the decedent." *Id*; *see also Turner v. Perry Cnty. Coal Corp.*, 242 S.W.3d 658, 660 (Ky. App. 2017) ("It is a well known and established rule of law in this jurisdiction that upon the death of a person intestate, title to his real estate immediately vests in his heirs at law[.]" (quoting *Rose v. Rose*, 176 S.W.2d 122, 124 (1943))).

Kentucky courts and other courts within the Sixth Circuit have continued to cite *Slone* and *Wood* for the proposition that "title to real estate in Kentucky vests in the heirs or devisees at the moment of death." *Roberts v. Girder*, 237 F.Supp.3d 548, 556–57 (E.D. Ky. 2017) (citations omitted); *see also Commonwealth v. Maynard*, 294 S.W.3d 43, 46–47 (Ky. App. 2009); *Rose v. Vanhoose*, No. 2015-CA-001001-MR, 2017 WL 2332687, at *4 (Ky. App. May 26, 2018). While Patty argues that *Slone*, *Wood*, and other such cases apply only to intestate estates, the

language employed by these courts clearly indicates that the rule applies to both testate and intestate estates. *See, e.g.*, *Slone*, 194 S.W.3d at 337 ("Upon death of an owner of real property, the title to said property passes directly to the heirs at law or to the beneficiaries under a will . . . ." (citation omitted)). Further, the *Stewart* case cited above (and cited in *Levin*) involved a will. *See Stewart*, 231 S.W.2d at 71.

In sum, Kentucky law is clear that the title to real estate vests in the decedent's beneficiaries at the moment of death, and the sources cited by Patty do not state otherwise. Accordingly, the Court finds that title in the Witty farm vested in Patty Witty at the time of her husband's death on June 3, 2017. As a result, Patty had authority to sell the property in her individual capacity at the time she entered into the sale contract with Brown. To effectuate that sale, she needed to establish the chain of title for the Witty farm, and as a result, probate of the will (the instrument of title) was necessary. The Court will therefore grant Brown's motion to the extent he seeks summary judgment on this issue and will deny Patty's motion to the extent she seeks summary judgment on this issue.

### B. Conditions Precedent

Having determined that Patty possessed the authority to sell the Witty farm, the Court next considers whether certain conditions precedent existed. Kentucky courts have defined a condition precedent as "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 785 (Ky. 2017) (quoting *BMD Contractors, Inc. v. Fidelity and Deposit Co. of Maryland*, 679 F.3d 643, 650 (6th Cir. 2012)) (internal quotation marks omitted).

Importantly, it must be clear from the language of the contract that the term at issue is in fact a condition precedent. In other words, "[t]o be considered enforceable, a condition precedent

must be clear and it must be shown that the parties have no agreement in the absence of the condition precedent." *Judd v. Bank of Marshall Cnty.*, No. 2005-CA-001862-MR, 2007 WL 1192714, at *2 (Ky. Ct. App. Apr. 6, 2007) (citation omitted). Unless it is clear "by plain, unambiguous language or by necessary implication," courts generally refrain from construing a term as a condition precedent." *Mfg. Corp. of Am. v. Justice*, 971 S.W.2d 288, 290 (Ky. 1998) (quoting *A.L. Pickens Co., Inc. v. Youngstown Sheet Tube Co.,* 650 F.2d 118, 121 (6th Cir. 1981)). "This is particularly so when interpreting a stipulation as a condition precedent would work a forfeiture or result in inequitable consequences." *Legacy Dev. Corp. v. Hous. Auth. of Louisville*, No. 2006-CA-000314-MR, 2006 WL 3691198, at *2 (Ky. Ct. App. Dec. 15, 2006). Simply stated, then, conditions precedent are "not favored." *Justice*, 971 S.W.2d at 290. However, if a precedent exists but is not satisfied, "the contract in question is not enforceable." *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 734 (Bankr. W.D. Ky. 1998) (citations omitted); *see also Legacy Development Corp. v. Housing Authority of Louisville*, 2006-CA-000314-MR, 2006 WL 3691198, at *2 (Ky. App. Dec. 15, 2006).

In the present case, Patty argues that Brown failed to satisfy two conditions precedent, thereby rendering the contract null and void. [DN 24-1, pp. 7–8]. First, she argues that the handwritten term requiring Brown to "pay for & take care of probate process for seller," [DN 25-1], is a condition precedent that Brown failed to satisfy. [DN 24-1, pp. 7–8]. Next, she argues that the deposit requirement is a condition precedent, and that Brown failed to satisfy this condition because she never received the $1000 check. *Id.* at 8. However, the Court finds that neither term is a condition precedent.

Patty fails to point to any clear, unambiguous language indicating that the terms at issue are conditions precedent. The phrases "condition precedent" or "contingent upon," or any

variations thereof, are not included in these terms. *See, e.g.*, *Legacy Development Corp.*, 2006 WL 3691198, at *2 (using phrase "contingent on" indicated that the term was a condition precedent). Such phrases *are* included in other areas of the contract, however. For example, the contract states, "This contract is contingent upon Buyer obtaining a loan" with certain specified terms. [DN 25-1, p. 1]. Cleary then, the parties understood that some terms—e.g., financing— would be considered conditions precedent. However, no such language was employed by the parties with respect to the deposit term, nor did they use any such language when adding the term requiring Brown to pay for the probate process. In fact, Patty fails to identify, and the Court has not found, any language in the contract that would even suggest those terms are conditions precedent.

As the Court has already explained, "[t]o be considered enforceable, a condition precedent must be clear and it must be shown that the parties have no agreement in the absence of the condition precedent." *Judd*, 2007 WL 1192714, at *2. The term must be identified as a condition precedent "by plain, unambiguous language or by necessary implication," *Justice*, 971 S.W.2d at 290, but no such language exists in this case, nor is there any language that would necessarily imply that the agreement is null and void in the absence of these terms. Given the lack of any such language and the general disfavor towards conditions precedent, the Court cannot say that the two terms at issue constitute conditions precedent. Thus, the failure to satisfy those terms does not automatically render the contract null and void, as Patty insists. The Court will therefore grant Brown's motion to the extent he seeks summary judgment on this issue and will deny Patty's motion to the extent she seeks summary judgment on this issue.

**C. Specific Performance or Compensatory Damages**

14

Having determined that the Patty possessed the authority to sell the property and there are no failed conditions precedent that would nullify the contract (or the parties' obligations to perform under the contract), the Court next considers Brown's claims for relief. Brown seeks a declaratory judgment stating that Brown is entitled to specific performance or, in the alternative, a declaratory judgment stating that Brown is entitled to compensatory damages, to be determined by a jury at a later date. [DN 25].

The right to specific performance has been described as an "extraordinary and delicate right." *W. Ky. Coal Co. v. Nourse*, 320 S.W.2d 311, 314 (Ky. 1959). It is not to be granted as a matter of right but is instead "always addressed to the reasonable discretion of the court, to be exercised according to the facts of each case." *Id.* To award specific performance, the Court must first conclude that the case is "entirely free from fraud, illegal or inequitable conduct" and the party requesting such relief has strictly complied (or is able and willing to comply) with all terms of the contract. *Id.* (citations omitted); *see also Twyford v. Twyford*, 243 S.W.2d 930, 933 (Ky. 1951). Because specific performance is an equitable remedy, the Court must also determine that there is no adequate remedy at law. *See Kuntz v. Peters*, 150 S.W.2d 665, 667 (Ky. 1941).

In this case, each party points to the allegedly inequitable conduct of the other. Patty, for example, argues that Brown mislead her about his intended use of the property, and he therefore has "unclean hands" and cannot benefit from specific performance. [DN 27, pp. 11–12]. Brown, on the other hand, has alleged that Patty willfully thwarted his attempts to perform under the contract by refusing to cooperate during the probate process. [DN 25, pp. 13–14]. It may very well be true that both parties are guilty of some level of inequitable conduct. However, the Court need not delve into this issue at depth because it finds that specific performance is inappropriate for another reason: the adequacy of a remedy at law.

Neither party addresses this issue in their briefing; however, Brown expressly requests an alternative remedy of compensatory damages. Specifically, he requests that, if specific performance is deemed inappropriate, he be awarded compensatory damages. [DN 25, p. 15]. According to Brown, compensatory damages would include the difference between the contract price and the market value of the property at the time of the breach or at the time fixed for delivery. *Id.* (citation omitted). Brown also notes that he has suffered various expenses, and compensatory damages could compensate him for those losses. *Id.* He does not argue that such compensatory damages would be inadequate. On this point, the Court notes that Brown apparently no longer intends to keep the property as a family homestead (in which case there might have been a stronger argument that compensatory damages are inadequate), and he would instead sell the farm. Accordingly, given the equities of this case and Brown's own request for compensatory damages, the Court finds that specific performance would be in appropriate.

However, the parties have glossed over an important prerequisite to relief: a breach of contract. Here, the Court has determined that the contract at issue is valid and enforceable. The Court must next determine if a breach of that contract occurred. On this point, Patty argues that Brown initially breached the contract by failing to pay his deposit and failing to ensure that the estate was properly probated, thereby rendering the contract null and void. This argument rests on Patty's characterization of those terms as conditions precedent, but the Court has already concluded that the terms are *not* conditions precedent and Brown's failure to satisfy them does *not* nullify the contract.

This does not mean, however, that Patty's obligation to perform under the contract was unaffected by Brown's alleged breaches. If Brown materially breached the contract, Patty might be justified in abandoning the contract, theoretically. *See Dye v. Thomas More University, Inc.*,

16

2:19-CV-087-CHB, 2021 WL 4006123, at *20 (E.D. Ky. Sept. 2, 2021) (citing *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956)). On the other hand, Brown argues that he made significant attempts to comply with these covenants, but Patty refused to cooperate, thereby preventing him from fulfilling those obligations. [DN 25, pp. 13–14]. In other words, he argues that he did not willfully breach the contract but was instead prevented from fulfilling his obligations by Patty's own actions. He provides some evidence in support of this claim, such as his emails to Patty regarding the probate process. *See* [DN 25-4; DN 25-5; DN 25-6; DN 25-7]. Patty, of course, disputes this claim. [DN 27, p. 14]. Overall, the parties' arguments relating to liability (specifically, breach and abandonment) are largely undeveloped.

Having reviewed the parties' arguments and the evidence of record, the Court finds that, at this time, it would be inappropriate to grant summary judgment on the issue of liability. Much of the parties' arguments regarding Brown's alleged breaches and Patty's lack of cooperation are speculative. While some evidence has been submitted to shed light on these arguments (such as the above-cited emails), the parties rely heavily on speculative statements made in their briefs, not in sworn deposition testimony or affidavits. Further, fact discovery has not yet concluded in this case, and the Court believes that further factual development could aid in the resolution of this issue. For example, while the Court has viewed Brown's emails to Patty, it is unclear if Patty responded to the emails or made efforts to comply with Brown's requests to facilitate the probate process.

Accordingly, the Court finds that there remains a genuine dispute of fact with respect to liability, and summary judgment is therefore inappropriate. The Court will therefore deny Brown's motion to the extent he seeks a judgment that Patty breached the contract and will not enter a declaratory judgment regarding relief (specific performance or compensatory damages) at

this time. However, because the July 15, 2022 deadline for fact discovery is quickly approaching, [DN 11], the Court will entertain a motion to extend that deadline, if necessary.

## IV.      CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that Defendants' Motion for Summary Judgment, [**DN 24**], is **DENIED** and Plaintiff's Cross-Motion for Summary Judgment, [**DN 27**], is **GRANTED IN PART** and **DENIED IN PART.** Plaintiff's motion is **GRANTED** to the extent he seeks a declaratory judgment that the contract at issue is valid and enforceable, and the motion is **DENIED** to the extent he seeks a declaratory judgment that Defendant breached the contract and that he is entitled to a certain form of relief.  A separate judgment shall follow.

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

July 14, 2022

cc: Counsel of Record

18